

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

JEFFREY CURRIE, )
)
    Plaintiff, )
)
    No.  06 C 3653
vs. )
)
    Magistrate Judge Schenkier
JO ANNE B. BARNHART, Commissioner )
of Social Security )
)
    Defendant. )

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

On September 23, 2004, plaintiff, Jeffrey Currie, filed an application for Social Security

Income ("SSI") benefits, alleging a disability beginning on August 1, 1997 (R. 60). His last insured

date was December 31, 2002 (R. 79). The Social Security Administration ("Agency") found that

Mr. Currie was not disabled, both initially and upon reconsideration (R. 22-23). On August 9, 2005,

Mr. Currie, represented by council, appeared at a hearing before an Administrative Law Judge

("ALJ") (R. 181-210). Thereafter, on October 26, 2005, the ALJ then issued a written decision

denying Mr. Currie's application for SSI benefits (R. 14-21). Mr. Currie filed a Request for Review,

and on March 13, 2006, the Appeals Council denied the request, making the decision of the ALJ the

final decision of the Commissioner of the Agency. (R. 4-6).

Plaintiff now seeks judicial review, pursuant to 42 U.S.C. § 405(g), of that final decision. The

parties have filed cross motions for summary judgment; Mr. Currie seeks reversal or remand, and

the Commissioner seeks a judgment affirming her decision. For the reasons set forth below, the

---

[1]On October 2, 2006, by consent of the parties, the Executive Committee reassigned this case to this court pursuant to 28 U.S.C. § 636(c) and Northern District of Illinois Local Rule 73.1(b), for all further proceedings and the entry of final judgment (doc. #16).

court grants the Commissioner's motion for summary judgment (doc. # 22) and denies Mr. Currie's motion for a remand (doc. # 21).[2]

## I.

The following facts are taken from the administrative record and the administrative hearing in which Mr. Currie testified. The Court will begin by discussing Mr. Currie's personal and medical history. We will then summarize the testimony at the administrative hearing. Finally, the Court will discuss the ALJ's written decision.

## A.

Mr. Currie was born on August 14, 1955 (R. 186). He attended four years of college, but he did not graduate (*Id.*). Starting in the 1970s, Mr. Currie worked as a manager at a roller rink in Chicago (R. 198). From 1984 to 1988, he had a manufacturing job for the Mead Corporation (R. 198-99). Thereafter, the defendant became disabled, and he was deemed entitled to SSI benefits starting in March 1989 due to "mood disorders" (R. 61).[3]

---

[2]We note that along with his motion for summary judgment, plaintiff attached a Local Rule 56.1(a)(3) statement of undisputed facts. The government has not disputed those fact statements, at least insofar as the government believes that they are "material to the issues raised by Plaintiff in his Memorandum" (Def.'s Mem. at 2). That said, we do not view the Local Rule 56.1 process for submitting fact statements in support (or opposition to) summary judgment to be applicable here, even though the motions are denominated as motions for summary judgment. In the normal summary judgment setting, our mission in the first instance is to determine whether there are any material facts that are genuinely disputed. If so, then we must deny the motion for summary judgment; if not, then we must determine the outcome of the case based on the application of the governing principles of law to the undisputed facts. By contrast, in reviewing the Commissioner's decision, our mandate is far more limited: we must affirm the decision if it is supported by substantial evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). In any event, we do not believe that the fact statement is in contradiction to the administrative record; it contains nothing that affects our view of the proper outcome of this case.

[3]The ALJ referred to the "mood disorders" as "affective disorder" (R. 14) and depression (R. 184). Plaintiff's counsel, who represented plaintiff in these earlier proceedings, says that the 1989 disability determination was based on a combination of depression and chronic kidney disease (Pl.'s Reply Mem. at 4 and n.4). Plaintiff's counsel also originally stated that the disability finding occurred in 1979 or 1980 (Pl.'s Mem. at 1). Plaintiff's counsel's recollections are not supported by the record. Thus, we rely on the administrative record (R. 61) for the date and basis of the earlier disability finding.

In 1994, Mr. Currie was offered a position at the roller rink where he had previously worked (R. 187). Even though Mr. Currie was receiving SSI benefits at the time, he accepted the position and was gainfully employed from 1994 to 1997 (R. 185). During this time, he received overpayments totaling $101,856.50 (R. 66). Mr. Currie was indicted by the United States government of tax and Social Security fraud (Pl.'s Mem. at 1-2). He subsequently pled guilty to these charges (*i.e.*, failing to file a tax return and Social Security fraud) (R. 204) in 2004 (Pl.'s Mem. at 2). According to Mr. Currie, on June 6, 2004, he was sentenced to a term of imprisonment (Pl.'s Fact St. ¶ 14); he was released from prison on September 13, 2004 (R. 59).

As a result of this conviction for tax and Social Security fraud, Mr. Currie's benefits were terminated.[4] Ten days after being released from prison, on September 23, 2004, plaintiff filed the present claim for disability benefits.

**B.**

Prior to serving time in prison, Mr. Currie received medical treatment for a variety of ailments. At least as of October 2002, his treating physician has been Dr. Seshan Subramanian. The medical records show that since October 2002, Mr. Currie has been receiving phlebotomy[5] treatments for polycythemia vera[6] (R. 165).

---

[4] In his decision, the ALJ stated that the termination of benefits occurred in July 2004 (R.14). However, a document in the record indicates that the termination of benefits occurred in October 2004 (R. 61). This discrepancy in the termination dates of the prior eligibility for disability benefits is immaterial to our decision.

[5] A phlebotomy is an "incision of a vein, as for the letting of blood." DORLAND'S MEDICAL DICTIONARY, 29th edition, at 1375.

[6] Polycythemia vera is "characterized by abnormal proliferation of all hematopoietic bone marrow elements and an absolute increase in red cell mass and total blood volume." DORLAND'S, at 1430.

3

In a progress note dated September 23, 2003, Dr. Subramanian wrote that Mr. Currie "feels good. Appetite, bowels and urination good. No chest pain. No shortness of breath. No dizziness" (R. 170). Dr. Subramanian stated that Mr. Currie's spleen tip was "palpable," but his lungs, heart, abdomen and extremities were normal and that his blood pressure was 140/70 (*Id.*). Dr. Subramanian indicated that he planned to perform a phlebotomy on Mr. Currie. In a progress note dated January 8, 2004, Dr. Subramanian indicated that he removed 500 cc's of blood from Mr. Currie, who tolerated the procedure well and left in good condition (*Id.*).

In a progress note dated February 12, 2004, Dr. Subramanian, diagnosed Mr. Currie with depression and chronic renal disease, in addition to polycythemia vera (R. 172). Dr. Subramanian noted that Mr. Currie's blood pressure was 160/100, his heart rate 76, his lungs were clear, his heart rhythm regular, pulses were good and extremities revealed no edema (*Id.*). Mr. Currie reported to Dr. Subramanian that he had not seen his renal doctor and was not taking medications. Mr. Currie also reported that at the time, he was being interviewed by the FBI and "he is having some kind of a problem," and was extremely depressed and had severe headaches (R. 172). Dr. Subramanian indicated a plan of performing another phlebotomy (drawing 500 cc's of blood), and asking Mr. Currie to see his renal doctor and to see a doctor about glaucoma (R. 172). On February 24, 2004, Mr. Currie was prescribed Zoloft for his depression (*Id.*).

On February 26, 2004, Mr. Currie presented to Dr. Chia Huang at Holy Cross Hospital complaining of chest pain, tightness in the epigastric area, and hypertension (R. 108). Dr. Huang diagnosed Mr. Currie with chest pain, uncontrolled hypertension, and history of chronic glomerulonephritis (R. 109). He was admitted to Holy Cross Hospital and had several tests performed. His kidney ultrasound was normal (R. 111). A chest X-ray revealed a normal heart size

4

and diffuse accentuation of the bronchovascular markings (R. 112). A cardiac stress test revealed a slightly decreased left ventricular ejection fraction, no stress-induced ischemia,[7] and no suggested infarctions[8] or fibrosis (R. 113).[9] A maximal exercise test with no electrocardiographic changes indicated myocardial ischemia (R. 115).[10] The results of an echocardiogram were normal except for some thickening of the aortic valve (R. 117). Mr. Currie was diagnosed with mild left ventricular hypertrophy (*Id.*).

Dr. Subramanian's progress note on March 19, 2004, showed a diagnosis of polycythemia vera, hypertension, chronic renal disease, and hiatal hernia with reflux (R. 174). Dr. Subramanian noted that Mr. Currie's blood pressure was 130/70, his pulse 82, his lungs clear and his heart rhythm regular (*Id.*). He also noted that Mr. Currie's abdomen was slightly distended, but bowel sounds were present, he had no edema in his extremities, and his pulses were good (*Id.*).

A progress note by Dr. Subramanian on April 2, 2004, repeated the diagnoses on the March 19 report and added the condition of ascites (R. 175).[11] Dr. Subramanian said that Mr. Currie indicated that he felt better after taking certain prescribed medication, but that he had some upper abdominal distress, he felt bloated all the time, and felt "somewhat tired" (*Id.*). Dr. Subramanian

---

[7]Ischemia is "deficiency of blood in a part, usually due to functional constriction or actual obstruction of a blood vessel." DORLAND'S, at 920.

[8]Fibrosis is "the formation of fibrous tissue." DORLAND'S, at 673.

[9]Infarction is "an area of coagulation necrosis in a tissue due to local ischemia resulting from obstruction of circulation to the area." DORLAND'S, at 894

[10]Myocardial ischemia is "deficiency of blood supply to the heart muscle, due to obstruction or construction of the coronary arteries." DORLAND'S, at 920.

[11]Ascites is "effusion and accumulation of serous fluid in the abdominal cavity." DORLAND'S, at 158.

found that Mr. Currie's blood pressure was 140/70, his lungs were clear, his abdomen was distended, there was a slight plethora present, and he had no edema in his extremities (*Id.*).

On April 2, 2004, Mr. Currie also saw Dr. Nighat Khan, an ophthalmologist. Plaintiff was diagnosed with glaucoma and conjunctival injection, but Dr. Khan gave Mr. Currie a good prognosis as long as plaintiff continued using eye drops (R. 136-37).

On April 23, 2004, Mr. Currie was admitted to Christ Hospital and Medical Center and was diagnosed with abdominal pain and a duodenal ulcer (R. 122). After a parendoscopy and colonoscopy, Mr. Currie was diagnosed with a duodenal ulcer, erosive esophagitis, a hiatal hernia, and redundant colon with a small rectal polyp (*Id.*).

On October 19, 2004, Dr. Subramanian completed a Renal Report on Mr. Currie (R. 128-29). The report was on a form provided by the Bureau of Disability Determination Services, and stated that information was being sought from Dr. Subramanian "to establish your patient's eligibility under the disability provision of the Social Security Act" (R. 128). The report diagnosed Mr. Currie with polycythemia vera, hypertension, and chronic renal disease (*Id.*). Dr. Subramanian also noted that Mr. Currie "can sit, stand, move about, lift & carry 10 lbs, [and] he can hear & speak well" (R. 129).

The next progress note from Dr. Subramanian was dated May 5, 2005. Dr. Subramanian noted that Mr. Currie did not receive any treatment while he was in prison, and he diagnosed plaintiff with polycythemia vera, hypertension, and history of glomerulonephritis (R. 178). Mr. Currie complained of an intense headache and injected eye problems at this time (*Id.*). His blood pressure was 180/100, his heart rhythm was regular, his lungs were clear, his pulses good, and he had no edema (*Id.*). Dr. Subramanian indicated a plan that involved performing another phlebotomy, providing various medication, and rechecking Mr. Currie's blood pressure (*Id.*). Thereafter, on

May 10, 2005, Mr. Currie was examined and showed a blood pressure of 148/92 (R. 176). His blood pressure on May 19 was 146/90 (*Id.*), and on May 27 his blood pressure was 120/70 (R. 177). On May 27, Dr. Subramanian performed a phlebotomy removing 500 cc's of blood from Mr. Currie's right arm, a procedure which Mr. Currie tolerated well (*Id.*).

Dr. Subramanian saw Mr. Currie again on July 1, 2005 (R. 179). Dr. Subramanian noted that Mr. Currie's polyarthritis responded to Naprosyn and was almost completely gone (*Id.*). Mr. Currie reported that he felt well, and was not suffering from headache or dizziness (*Id.*). Mr. Currie's blood pressure was 130/80, his lungs were clear and heart rhythm regular, and his extremities were "okay" (*Id.*).

## C.

Mr. Currie received a hearing before an ALJ on August 9, 2005. Before Mr. Currie testified, his attorney told the ALJ that Mr. Currie suffered from the same ailments he had when he was first granted SSI benefits, and that Mr. Currie lost his benefits "simply because he was in custody" (R. 184). The ALJ responded by saying that Mr. Currie's benefits were "ceased because he was working and he didn't report it" (*Id.*). Mr. Currie's attorney noted that it was "difficult to understand how [Mr. Currie] was working because he just couldn't do the work" (R. 185). The ALJ responded by noting that Mr. Currie had earned substantial income between 1994 and 1997 (*Id.*). The ALJ then said,

"Well, I think [the government] found that he was able to perform substantial gainful activity because he had been performing substantial gainful activity, and the false statements were . . . that he was denying that he was working. And this wasn't, I guess, just a normal omission or forgetting to tell [the government]. This was an actual statement that [Mr. Currie] made that he wasn't working . . . ."

(*Id.*).

The ALJ then said to Mr. Currie,

> [A]lthough our procedures are less formal than what you may be accustomed to they are of course very serious to you and very legal so I am going to ask you—I am going to tell you that I often decide my cases based on whether I believe someone is telling me the truth or not, and the best way to assure that is to tell me the truth"

(*Id.*).

Mr. Currie then testified about the work he did at the roller rink between 1994 and 1997 (R. 187-92). He testified that he performed "odds and ends," including signing for vendors and picking up food and beverage items (R. 187). When the rink purchased new skates, Mr. Currie helped deliver them; this involved lifting boxes that weighed approximately twenty pounds (R. 188-90). Mr. Currie also interacted with customers by showing them rooms available for parties and discussing rental rates, and signing agreements on behalf of the rink (R. 188-89). Mr. Currie testified that the job involved "quite a bit of standing and walking" (R. 189).

The ALJ asked Mr. Currie whether he would take the roller rink job if it were still available (R. 191). Mr. Currie initially said that he would not take the job "because the most valuable thing to me from being on Social Security was I needed my medical benefits because I was ill . . . . That's the most important thing to me" (R. 191). In response to a follow-up question from the ALJ, Mr. Currie then said that he would be interested in the job "[i]f I had benefits along with it" (R. 192). It was not until the question was put for a third time that Mr. Currie said that he did not believe he could do the job "on a consistent basis all day" (*Id.*). Mr. Currie said he had angina, which caused him chest pain, heart palpitations, and shortness of breath (R. 192-93). Mr. Currie also said he suffered from gout and arthritis, which he said bothered him once a month, depending on the weather

(R. 193-94). He also complained of fatigue, saying he is "constantly tired" (R. 192). Mr. Currie also testified that he has been receiving treatment for depression since 1988 (R. 193).

After Mr. Currie described his ailments, his attorney asserted that Mr. Currie's condition has not changed since he was first deemed eligible for SSI benefits (R. 194). The ALJ responded by saying, "I think the record supports, sir, that he worked for four years and that he can't really be found disabled due to a condition that didn't prevent him from working" (*Id.*).

The ALJ then resumed questioning Mr. Currie about his physical condition. Mr. Currie testified that his last gout "attack" lasted approximately one week and left him "just about crippled" (R. 196). The ALJ then asked Mr. Currie what he did the day before the hearing (*Id.*). Mr. Currie initially testified that he awoke at 11:00 a.m.; then he corrected himself by saying that he drove his brother to work at 8:00 a.m. (R. 197). Mr. Currie then asked to "start over," and testified that he dropped his brother off at his "ride," which is ten to fifteen minutes away from their house (*Id.*). The ALJ then asked Mr. Currie if there were any problems with his hands or feet, and Mr. Currie said there were none (*Id.*).

Mr. Currie was then examined by his attorney. During the examination, Mr. Currie contradicted his earlier testimony – and the 1989 finding of depression that was a basis for his earlier disability status – by claiming that he began to suffer from depression in the late 1990s (R. 200). Mr. Currie also testified that he has been receiving phlebotomy treatments since the mid-1990s (R. 202). When Mr. Currie's attorney finished his examination, the ALJ asked Mr. Currie why he went to prison (R. 204). Mr. Currie said he was charged with Social Security fraud and failing to file a tax return, and that he admitted the charges on the advice of his attorney (*Id.*).

9

A vocational expert ("VE") then testified that Mr. Currie's previous work at the roller rink was "at the very low end of semi-skilled, light level physical tolerance" under the *Dictionary of Occupational Titles* (R. 206). Although the VE recognized that Mr. Currie's precise job duties at the roller rink were not entirely clear, he did testify that Mr. Currie's experience working with vendors and skate companies gave him transferable customer service skills (*Id.*). The ALJ then asked the VE whether Mr. Currie could perform his past relevant work, given Mr. Currie's age, education, work experience, and inability to lift more than ten pounds (*Id.*). The VE answered that Mr. Currie could not perform his past work because the job at the roller rink required him to be able to lift twenty pounds (R. 207). However, the VE testified that Mr. Currie could use his transferable skills to work as an order taker, which is a sedentary occupation (*Id.*). The VE said there were 1,750 such jobs available in the national economy (*Id.*). The VE also said that Mr. Currie could perform the sedentary job of customer service representative, and that there are 4,800 such jobs in the national economy (*Id.*). The VE also testified that there were 9,600 customer service representative jobs at the light level, which Mr. Currie could perform if he could do prolonged standing and walking (*Id.*).

On examination by Mr. Currie's attorney, the VE testified that the difference between a light customer service job and a sedentary customer service job is the ability to stand throughout the day, for six out of eight working hours (R. 208). In response to a question by plaintiff's attorney, the VE testified that none of the jobs he identified would be available to Mr. Currie if Mr. Currie were to miss more than one and three-quarters days per month of work on a regular basis (*Id.*).

**D.**

The ALJ issued his decision on October 26, 2005 (R. 14-21). He applied the standard five-step sequential evaluation pursuant to 20 C.F.R. §§ 404.1520 and 416.920 (2002). At step one, the ALJ found that some evidence suggested that Mr. Currie might have resumed working at his brother's roller rink since the claimed September 13, 2004 onset date for disability (R. 16). However, the ALJ decided that it was not necessary to determine whether Mr. Currie was working because there was an independent reason for denying the claimant's application (*Id.*).

At step two, the ALJ found that Mr. Currie's impairments of polycythemia vera, hypertension, chronic renal disease, and a hiatal hernia with reflux disease met the definition of "severe" under the Regulations (*Id.*). However, at step three, the ALJ found that Mr. Currie's impairments did not meet or equal the impairments listed in Agency regulations (*Id.*). The ALJ also noted a lack of evidence that Mr. Currie's impairments had resulted in lasting effects of twelve months or more (R. 18).

The ALJ then moved to step four and determined Mr. Currie's Residual Functional Capacity ("RFC") (R. 18-20). The ALJ considered Mr. Currie's hearing testimony and determined that it was not fully credible for several reasons. The ALJ noted that Mr. Currie's testimony was inconsistent with objective medical evidence (R. 18). The ALJ also noted that Mr. Currie had previously been convicted of fraud against the Agency, "which indicates a willingness to be less than candid in his approach to qualifying for benefits" (*Id.*). The ALJ also appeared skeptical of Mr. Currie's claimed onset of disability, which coincided with the date his previous benefits were terminated (*Id.*). Finally, the ALJ pointed out that Mr. Currie's testimony about his symptoms and limitations was not entirely credible, because Mr. Currie admitted that he was able to perform a variety of physical

11

activities, such as driving his brother to and from work and performing "yard work" and "weight lifting" (*Id.*).

Continuing his analysis under step four, the ALJ then rejected the findings of the state agency medical consultants because they were inconsistent with the overall record, which indicated that Mr. Currie did suffer from "severe" impairments (*Id.*). Pursuant to Social Security Ruling 96-2p, the ALJ gave controlling weight to Dr. Subramanian, Mr. Currie's treating physician (*Id.*). The ALJ relied on Dr. Subramanian's Renal Report, and found that Mr. Currie can "sit, stand, move about and lift and carry objects weighing up to ten pounds." The ALJ determined that Mr. Currie can sit, stand, and walk for six hours in an eight-hour work day (R. 19). The ALJ then found that plaintiff "can perform a full range of sedentary work, and a range of light work restricted only by the lifting limitation of ten pounds" (R. 19). The ALJ then determined whether Mr. Currie could perform any of his past relevant work, which in Mr. Currie's case was his job assisting the manager of a roller skating rink (*Id.*). Because that position required Mr. Currie to lift twenty pounds, the ALJ determined that Mr. Currie was no longer able to work that job (*Id.*).

Having determined that Mr. Currie could not perform his past relevant work, the ALJ moved on to step five, which requires the Administration to present evidence that there are other jobs that exist in significant numbers in the national economy that the claimant can perform. The ALJ relied on the VE's hearing testimony that Mr. Currie obtained transferable customer service skills from his experience working at his brother's roller rink (*Id.*). The ALJ then reiterated the VE's testimony that Mr. Currie – given his age, education, work experience, and RFC – could work as a customer service representative (R. 20). The ALJ stated that there are 9,600 such jobs in the national economy (*Id.*).

12

Consequently, the ALJ determined that there was a substantial number of jobs that Mr. Currie could perform, and that he was "not disabled" under the regulations (*Id.*).

## II.

In order to establish a "disability" under the Social Security Act, a claimant has to show an "inability to engage in a substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (2002). A claimant is deemed disabled only if he cannot perform his previous work or any other substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A) (2002). Social Security regulations prescribe a sequential five-step test to determine whether a claimant is disabled. Under that test, an ALJ must consider: (1) whether the claimant is currently unemployed; (2) whether the claimant's medical impairment or impairments are severe; (3) whether the claimant's impairments meet or equal any impairment listed in the regulations as being severe enough to preclude substantial gainful activity; (4) if the impairment or impairments are not listed as conclusively disabling, whether the claimant can perform her past relevant work; and (5) if the claimant cannot perform his past work, whether he is able to perform any other work that exists in substantial numbers in the national economy. *See* 20 C.F.R. § 404.1520 (2002); *Young v. Secretary of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992). A negative finding at any step other than step three precludes a finding that the claimant is disabled. *Young*, 957 F.2d at 389. In steps one through four, the claimant bears the burden of proof; at step five, the burden of proof shifts to the Commissioner. *Id.*

13

Because the appeals council found no reason for further review, the ALJ's findings are the final determination of the Commissioner. We must affirm the Commissioner's (*i.e.*, the ALJ's) decision if it is supported by substantial evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* We review the entire record, but in so doing "we may not decide the facts anew, reweigh the evidence, or substitute our own judgment for that of the Secretary." *Id.* The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Secretary of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992). The Commissioner's decision may be supported by substantial evidence, even if a reviewing court might have reached the opposite conclusion had it reviewed the case *de novo*. *Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986) (per curiam). Furthermore, when an ALJ makes a credibility determination, the Court will reverse it only when the claimant can show that it is patently wrong. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

Although we give deference to the ALJ's determinations, the deference is not unlimited. An ALJ must "articulate reasons for accepting or rejecting entire lines of evidence." *Herron*, 19 F.3d at 333. The ALJ must consider all the relevant evidence, not just the evidence that supports his final decision. *Id.* In reaching a decision, the ALJ must "build an accurate and logical bridge from the evidence to [the] conclusion." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The purpose of this "bridge" is to "provide some glimpse into the reasoning behind [the ALJ's] decision to deny benefits." *Id.* at 889. Likewise, when an ALJ makes a credibility determination, the ALJ must give specific reasons for the determination. *Id.* at 887.

14

**III.**

Mr. Currie does not challenge the ALJ's determinations at steps one through four. Plaintiff only alleges that the ALJ's RFC determination at step five was not supported by substantial evidence. At this step, the ALJ found that Mr. Currie can perform a full range of sedentary work, and a range of light work restricted only by the limitation of lifting ten pounds (R. 19).

The regulations define sedentary work as involving "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. 404.1567(a) (2002). "Light work" is defined as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. 404.1567(b) (2002).

Mr. Currie raises four challenges to the ALJ's RFC determinations. However, these arguments do not persuade the Court that the ALJ's determination was not supported by substantial evidence. We address each argument individually below.

**A.**

*First*, Mr. Currie alleges that the ALJ's summary of Dr. Subramanian's RFC evaluation is incomplete. Plaintiff faults the ALJ for relying on Dr. Subramanian's report from October 2004, which reported that Mr. Currie could "sit, stand, move about, lift & carry 10 lbs, [and] he can hear and speak well" (R. 129), and not giving adequate consideration to other treatment records. Plaintiff

15

cites to the progress note from April 2004 that diagnoses Mr. Currie with ascites and records plaintiff's complaints of fatigue and weakness (Pl.'s Mem. at 10). Mr. Currie further alleges that Dr. Subramanian's records show that plaintiff's hemoglobin is high normal, and that he suffers from chronic renal disease.

These arguments miss the mark. To begin with, Dr. Subramanian was plaintiff's long-time treating physician. The regulations support the ALJ's decision to give "controlling weight" to the treating physician's findings when they are well supported and not inconsistent with other substantial evidence in the record, such as other medical expert opinions. *See* 20 C.F.R. § 404.1527(d)(2). We see no basis to conclude that Dr. Subramanian's October 2004 report was not well supported, or was inconsistent with other medical evidence.

Moreover, we disagree that the ALJ disregarded other portions of Dr. Subramanian's treatment record. Contrary to plaintiff's suggestion, the ALJ did consider (and in fact found) that Mr. Currie suffered from chronic renal disease and polycythemia vera (R. 20, Finding 3). Moreover, the medical record shows that while Mr. Currie had an episode of ascites in April 2004, he was not diagnosed with that condition either prior to that date or at any other time thereafter. Moreover, while Mr. Currie reported in April 2004 that he felt "somewhat tired" (R. 175), he had not recited that complaint prior to April 2004 and did not do so in any of the visits with Dr. Subramanian thereafter.

In sum, taken as a totality, the record of Mr. Currie's treatment with Dr. Subramanian shows that Mr. Currie suffers from a number of conditions which require ongoing attention and care. However, those records do not require the conclusion that the ALJ's assessment of plaintiff's RFC lacks substantial evidentiary support.

16

**B.**

*Second*, Mr. Currie alleges that portions of the ALJ's summary of the evidence are not supported by the record. Plaintiff notes that the ALJ found that Mr. Currie drove his brother to and from work every day, whereas Mr. Currie testified that he only drove his brother to a co-worker's house ten minutes away (Pl.'s Mem. at 10). Plaintiff also notes that while ALJ found that Mr. Currie lifts weights and does yard work, the record shows that Mr. Currie only lifts five to ten-pound weights for therapeutic reasons twice a month, mows half of his lawn every week, and spends 30 minutes a week washing his car (*Id.*).

While there are some minor discrepancies between the ALJ's description of Mr. Currie's physical activities and plaintiff's own description, these differences do not show that the ALJ's RFC determination was not supported by substantial evidence. Mr. Currie has admitted that he lifts weights weighing up to ten pounds; whether the ALJ describes this as "weight lifting" or "therapeutic" exercises, the record still supports that Mr. Currie can lift enough weight to perform sedentary level work. Likewise, the evidence that Mr. Currie washes his car and mows his lawn on a weekly basis supports the ALJ's RFC determination, regardless of whether these activities amount to "yard work." Lastly, it does not matter whether Mr. Currie drove his brother to work or to a co-worker's house; the mere fact that plaintiff got up in the morning and drove his brother *anywhere* supports the ALJ's determination that plaintiff can wake up in the morning, drive to work, and more importantly, sit and stand in doing so. These activities contribute to the ALJ's overall conclusion that plaintiff can perform sedentary work. Although none of this evidence, taken together or in isolation provides substantial evidence for the sedentary work finding, it contributes to that finding when it is added to the total mix of evidence, including Dr. Subramanian's report.

17

**C.**

*Third*, Mr. Currie alleges that the ALJ improperly discounted his hearing testimony of fatigue and weakness. While conceding that the ALJ was "well within legal bounds" in making this credibility determination, Mr. Currie maintains that his prior conviction "does not automatically mean that the ALJ's RFC determination is based on substantial evidence" (Pl.'s Mem. at 11).

Nowhere did the ALJ state or suggest that Mr. Currie's prior conviction "automatically" meant that the RFC determination was based on substantial evidence. Rather, the ALJ simply made a credibility determination. In doing so, the ALJ must give specific reasons for the determination. *Zurawski*, 245 F.3d at 887. The Court will reverse the ALJ's credibility determination only when the plaintiff can show that it is patently wrong. *Powers*, 207 F.3d at 435.

Here, the ALJ cited several reasons for finding Mr. Currie's testimony not entirely credible. In addition to citing Mr. Currie's prior fraud conviction, the ALJ noted that plaintiff's testimony was inconsistent with the objective medical evidence, and with plaintiff's own admissions about his daily activities. What's more, plaintiff's argument ignores that the record of treatment with Dr. Subramanian does not support the proposition that plaintiff suffers from chronic fatigue and weakness. In some three years of treatment records, there is only one occasion – April 2004 – in which Mr. Currie reported to Dr. Subramanian any issue with fatigue. And, on that occasion, he merely stated that he "feels somewhat tired" (R. 175). We see nothing in the medical record indicating any ongoing problem with "weakness." The ALJ gave adequate reasons for his credibility determination, and Mr. Currie has failed to show that the determination was patently wrong.

**D.**

*Fourth*, Mr. Currie alleges that the ALJ did not adequately address the signs and symptoms of polycythemia vera or glomerulonephritis. Mr. Currie maintains that the ALJ should have sought the opinion of a medical expert because the ALJ was not likely to be familiar with them (Pl.'s Mem. at 11).

The Court fails to see what more the ALJ should have done. The ALJ properly gave controlling weight to Mr. Currie's treating physician. Dr. Subramanian prepared a Renal Report in which he noted that Mr. Currie "can sit, stand, move about, lift & carry 10 lbs," and can "hear and speak well" (R. 129). In the most recent progress note in the record, dated July 1, 2005, Dr. Subramanian noted that Mr. Currie felt well and was not complaining of headache or dizziness (R. 179). The ALJ relied on Dr. Subramanian's records to find that Mr. Currie suffers from polycythemia vera and chronic renal disease, but is still able to perform sedentary work (R. 18-19).

Although "the procedure for adjudicating social security disability claims departs from the adversary model to the extent of requiring the administrative law judge to summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled," *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000), we do not believe the ALJ was required to call a medical expert in this case. While some of Mr. Currie's disorders may be "exotic," the ALJ did not embark on his own, independent analysis of the effects of those disorders. Rather, he relied on the reports of Dr. Subramanian, a trained physician who had treated Mr. Currie for years. The ALJ did not err by declining to seek the opinion of additional experts. *See Hawkins v. Barnhart*, 2003 WL 1717076 at *14 (N.D. Ill. Mar. 31, 2003) (ALJ not in error when he declined to call an expert to read an MRI and instead summarized the interpretation of the MRI by claimant's physician).

19

We do have concern about the ALJ's finding that Mr. Currie "can sit, stand, and walk for six hours respectively in an eight hour workday" (R. 19). The ALJ pointed to no evidence in the record to support the finding that Mr. Currie could walk or stand up to six hours a day. That puts into question his ability to do light work, which requires an ability to stand and walk "a good deal." However, other evidence in the record supports the ALJ's finding that Mr. Currie can, at the very least, perform sedentary level work as sedentary work is defined in the regulations (*i.e.*, lifting no more 10 pounds, sitting and a certain amount of standing and walking). *See*, 20 C.F.R. 404.1567(A). Mr. Currie admitted that he can and does perform a variety of physical tasks around the house which require sitting, standing, and walking. Moreover, the medical evidence, including Dr. Subramanian's Renal Report and the progress note dated July 1, 2005, support the ALJ's findings. And, although there is no medical evidence to support a light work finding which, by definition, requires an ability to stand and walk "a good deal," the VE testified that there are 4,800 customer service jobs and 1,750 order taker jobs at the sedentary level in the national economy that Mr. Currie can perform.

Any shortcoming in the ALJ's step five determination that plaintiff can perform light duty work is harmless. *Newell v. Office of Workers' Compensation Programs*, 933 F.2d 510, 512 (7th Cir. 1996) (ALJ's determination will not be overturned based on an error that, if corrected, would not change the outcome). Therefore, we will not disturb the ALJ's step five determination.

## IV.

Finally, we consider Mr. Currie's argument that we should grant his motion for summary judgment because the ALJ exhibited bias against him (Pl.'s Mem. at 7-8). To support this argument, Mr. Currie cites a portion of the hearing transcript where the ALJ discusses the plaintiff's prior conviction and admonishes Mr. Currie to tell the truth during the hearing (R. 184-85). Plaintiff

20

alleges that these statements show that the ALJ was "openly hostile" to him and that he was denied a fair hearing officer (Pl.'s Mem. at 8). Mr. Currie also alleges that several of the ALJ's statements about Mr. Currie's background were not supported by evidence in the record and infers that "the ALJ's attention was fixed on something other than the medical evidence" (Pl.'s Reply Mem. at 3-4). Specifically, plaintiff points to the ALJ's statements about the reason Mr. Currie's original SSI benefits were terminated, the reason for his criminal prosecution, and the rationale for his initial disability determination in 1989 (*Id.*).

The parties dispute the proper standard for considering the question of alleged ALJ bias. The Commissioner argues that the plaintiff "must show that the ALJ engaged in conduct that was so extreme it deprived the hearing of fundamental fairness mandated by due process (Commr's Resp. at 7) (*citing Liteky v. United States*, 510 U.S. 540, 555-556 (1994)). Mr. Currie, on the other hand, argues that he need only show that the ALJ "prejudged his claim" (Pl.'s Reply Mem. at 2) (*citing* 20 C.F.R. 404.940 ("An administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision.")). Mr. Currie asserts that this standard presents "a much lower legal barrier" than the standard submitted by the Commissioner (Pl.'s Reply Mem. at 2). We need not decide which standard is appropriate because Mr. Currie has not come close to meeting the burden of even the "lower" standard he supports.

*First*, there was evidence in the record to support the ALJ's statements about Mr. Currie's initial disability determination, his conviction, and the termination of his Social Security benefits. The record shows that the primary diagnosis at the time of Mr. Currie's initial disability determination was a mood disorder (R. 61). Furthermore, the record shows that Mr. Currie earned

21

substantial income after he was deemed disabled (R. 70), that he received benefits overpayments of more than $100,000 (R. 66), and that he served time in prison (R. 56, 58-59). Thus, contrary to plaintiff's assertions, the ALJ's statements were supported by substantial evidence in the record.

*Second*, none of the ALJ's hearing remarks about Mr. Currie's prior conviction suggest that he was prejudiced against Mr. Currie. Mr. Currie's attorney, not the ALJ, raised the issue of the conviction by wrongly asserting that plaintiff lost his benefits "simply because he was in custody" (R. 184). Having been notified of the conviction, the ALJ did not, in this Court's view, exhibit bias by stating that, in light of Mr. Currie's conviction, plaintiff should take care to testify truthfully. In sum, there is no evidence that the ALJ applied his knowledge of Mr. Currie's conviction in an improper way. Because it is plaintiff's burden to establish prejudice, the lack of evidence showing bias leads us to conclude that the ALJ was not prejudiced against Mr. Currie simply because the ALJ knew of plaintiff's conviction and mentioned it during the hearing.

## CONCLUSION

The Commissioner's motion for summary judgment (doc. # 22) is granted; the plaintiff's motion for summary judgment (doc. # 21) is denied. The Clerk of the Court is directed to enter a final judgment pursuant to Rule 58. This case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: April 6, 2007**